Case number 23-3100. United States of America v. Demetrius Green Appellant. Ms. Runkle for the appellant. Mr. Hansberg for the appellate. Ms. Runkle, good morning. Good morning, your honors, and may it please the court. Molly Runkle for Demetrius Green. I would like to reserve three minutes for rebuttal. In January of 2020, federal law enforcement officers mounted a continuously recording hidden camera on a rooftop as part of a criminal investigation that had nothing to do with Demetrius Green. In clear view of that frame was the back porch of 917 Waller, the home where Mr. Green was staying. A federal agent later received a notification from an AI-based gunshot detection system, alerting her that shots may have been fired somewhere in that vicinity. That agent then accessed that poll camera footage on her cell phone, allowing her to travel back in time to watch a perfect visual recording of the activities behind the home. She did not have a warrant when she searched that camera footage. Under the Supreme Court's decision in United States v. Carpenter, as well as the principles underlying the Fourth Amendment, that action was an unlawful search. Are you saying the police need to have a warrant to check a poll camera footage? Yes, your honor, unless there is some exception to the warrant requirement that applies such as an exigency. So why would they need a warrant for a poll camera that they possess that's only looking at things that are publicly available? Because your honor, in United States v. Carpenter, the Supreme Court held that once the police start to collect a compendium or a large aggregation of activities that are otherwise public, then an individual may start to have a interest. There, for example, Mr. Carpenter was traveling out and about in public, but the cell site location information was a recording of that public information, as the Supreme Court noted. That was a GPS monitor on the defendant's car. This is a public camera trained on public spaces. Your honor, I think you're speaking to Jones. That's the GPS case attached to the car. The cell site location information in Carpenter was collected by third-party cell site and was pinging on cell phone towers. Here, I think, if anything, the video recording of the poll camera was a more serious intrusion on privacy, not less, for two reasons. First, here we're talking about video recording. In Carpenter, the police get dots on a map where the cell phone tower pinged most close to wherever the individual was. Here, we're talking about actual video recording. But I guess I'm just having, I'm trying to understand your argument. It just seems to me that for the cell site location, you needed a warrant because you had to focus in on a particular person because this is like a big mass of data, and you need a warrant to say, like, we have probable cause to focus in on one person. But a poll camera just seems different because it's just trained on one spot. This one wasn't even aimed at your client. It's just like, it's almost like an observation post, which is you just are looking at a public space. And so it just strikes me as strange that the government would need a warrant to look at their own camera that's trained on a public space that's fixed and not targeted any particular person. Well, as to the fact that this is the government's camera, as opposed to something from a third party, the Supreme Court in Carpenter said whether the data comes from the government itself or a third party, individuals maintain a reasonable expectation of privacy in the whole of their public activities in that compendium. Here, we're talking about a compendium of activities in one spot around a home. And while in Carpenter, Mr. Carpenter would have been out and about in Here, we're actually talking about video recording, a much more serious intrusion on privacy, and the fact that this camera captured somebody's home. The outside. Yes, that's correct. The back porch, back door. And in fact, Mr. Green was actually seen inside the home through the window in the back door as well. So here, the Supreme Court has reiterated again and again, that the area surrounding a home immediately next to the home is intimately linked with the home. This is where Fourth Amendment privileges and privacy interests are at their absolute highest. So in this way, I think that the privacy interests implicated here are actually greater. One of the things the government says that you shouldn't even be able to raise this argument. That's what the district court seemed to say as well. And our cases seem pretty clear, at least that you need to be able to show you at an absolute minimum had permission to be on the premises. But it seems like Green's counsel disclaimed any intent to make that argument for understandable reasons and didn't put on any evidence of having permission to be there. So what's your best response to that? A couple of things, Your Honor. First, under United States v. Sheffield, a case from this court, it is the government's burden to raise Fourth Amendment standing in the district court. The district court can raise issues on its own as well. I understand, Your Honor, but I think here it's particularly relevant that the government didn't raise it, given that the government's entire theory of their case was that Mr. Green lived in the home, had everything in the home. Their entire theory was that he was the sole occupant and could therefore be attributed to all of the items within the home. Under those circumstances, I think the forfeiture issue is a little more concrete. But in any event, the district court did take judicial notice of the items on the docket, as well as the evidence that had been presented at an earlier evidentiary hearing on the first suppression motion. That evidence included the poll camera footage showing that Mr. Green would have been in the house at least overnight and then through 12 hours. The concern is that there's absolutely evidence that he was there. And the question I have is, is there any evidence he had permission? Your Honor, I think that cited in the government's detention hearing briefing is a sort of a recitation of all of the evidence in the case. And again, Judge Jackson said she was taking judicial notice of the items on her docket. There was evidence showing that Mr. Green had a more significant connection to the home. They spoke about how his items were around the house, for example. Earlier in the pretrial conference when the suppression motion was reiterated, the government proffered that Mr. Green had been using the bathroom. The government made a lot of hay in the case that he was making a salad. And I think when you look at this stack of evidence, it's not unreasonable to think he was there with permission. This is not like United States versus Gale, where there was affirmative evidence that the individual did not have permission to be in the home. He did not have the key. The key had been changed. So given those kind of distinctions, I think there was sufficient evidence. So can I take you to the evidentiary issues? Sure, Your Honor, of course. To assume for the moment that I agree with you that the text referencing marijuana was improperly admitted, can you just give us your best argument that that was not harmless? And in particular, I'm curious what element of the offense you think the jury would have used that for in an improper way? Sure, Your Honor. So I think that the text was not harmless because it was really the only evidence in the government's case that Mr. Green was a drug dealer. The government didn't put on any evidence explaining how Mr. Green, an indigent individual, came to possess $30,000 worth of prescription pain pills. They didn't explain that he knew what to do with them, that he knew how to sell them. There was just no evidence about that in the case. The only evidence that he had ever offered to sell somebody narcotics was this text message offering to sell marijuana to an unknown individual. Well, the quantity of the drugs is evidence of intent to distribute, isn't it? Yes, Your Honor, but in terms of constructive possession, we maintain that there was not sufficient evidence that Mr. Green possessed that quantity of drugs, and the government never... I'm just saying that that's not the only evidence of distribution. The text was not, because whoever possessed that large quantity of drugs intended to distribute them, because that's too much for one person to consume. Absolutely, that whoever possessed those drugs intended to distribute them. I don't dispute that, but in terms of Mr. Green being the individual who was going to distribute those drugs, the government just never answered a lot of those important questions. So it seems like everyone agrees the key issue was constructive possession, and one concern for your harmlessness argument, that my understanding is that we have to proceed as if a limiting instruction was read that said you can only consider this for intent. In other words, don't consider it for constructive possession, and your theory needs to be that I think the jury disregarded that limiting instruction. Otherwise, the conclusion would be the text can't possibly have affected their consideration of constructive possession, and therefore it's harmless. Your Honor, there was no limiting instruction. I understand that, because Mr. Green asked for there not to be one. Correct. And I guess, so here's my question. Do you disagree? The government makes the point, which I think is supported in some of our cases, that when you do that, when we consider prejudice on appeal, we have to assume the instruction was given. You can't benefit from your understandable choice not to have this evidence re-emphasized. So don't we have to proceed as if a limiting instruction was read? Your Honor, you're welcome to proceed as though a limiting instruction was read, but that wouldn't cure the issue here. There's a distinction between asking for a limiting instruction, saying that evidence was only admissible for a permissible purpose, and our argument, which is that there was no permissible purpose under which this evidence could have been admitted. So I don't think we forfeited anything by saying we don't want a limiting instruction when our position from the very beginning has been that this evidence should never have come in at all for any purpose under Rule 404. If the text had just said, come support my hustle, would that have been admissible, if it didn't say anything about tree? I don't think so, Your Honor. I think there would still Why doesn't that go to intent to distribute? Because there's no evidence that would go to that suggests that that text message would go to intent to distribute the types of narcotics that were found in the home. The government cites a lot of cases showing that previously evidence has been admissible to show that somebody who's previously sold one type of drug can be admissible to show that here they know how to sell. I'm putting aside the type of drug if there's evidence that this person has previously said, come support my hustle, meaning come support my selling of drugs. How can that possibly not be probative of intent to sell other drugs that he's found to possess? Well, Your Honor, I think that's propensity evidence. I think that's evidence that he has the character of the drug dealer. He's dealt drugs before, so he dealt drugs here. That's an impermissible purpose under Rule 404. What's an example of a permissible purpose? It just seems to me that that's a very straightforward application of this not just being propensity evidence because the issue on trial is whether he had the intent to distribute, and if he has previously had the intent to distribute. I don't think there was a huge time difference between. Not with the text message, that's true. So how can that possibly, based on your reading of Rule 404b, I don't know what could ever come in. Well, this court has held that, for example, evidence that somebody has previously distributed crack cocaine can be evidence that here they knew what crack cocaine looks like. They know how to sell it. You know, that helps answer some of those questions that are relevant to the case. Here, the only thing that the text message would be relevant to prove is that because Mr. Green previously sold drugs, he sold drugs today. That's not a lawful purpose under Rule 404. All right, we'll give you a couple minutes to reply. Okay, thank you, Your Honor. Mr. Hansford. Good morning, and may it please the Court, Eric Hansford for the United States. As all eight circuits to address the poll camera issue have held, a defendant has no expectation of privacy in areas of the home that are exposed knowingly to the public, and therefore a poll camera's installation does not constitute a Fourth Amendment search. That is consistent with what the Supreme Court has said in cases like Kelo and Serallo, which have consistently recognized that visual surveillance of a home is not a search, and that is also consistent with the recent decisions in cases like Carpenter and Jones. Indeed, Carpenter specifically said, we do not call into question conventional surveillance techniques and tools such as security cameras. So that left those cases in place. As to the— It sounds like an argument that you just think the mosaic theory could never apply to a poll camera. Is that essentially the argument? Because you have, in Carpenter and in Jones, it's exposed to the public. Yeah, I mean, I think we view the mosaic theory as generally going to a person's movements, which are not the sorts of things that are exposed by a poll camera, because the poll camera is fixed in a single location, and so you can't kind of construct a person's life in the same way that you can, that the court goes through in cases like Carpenter and Jones. It's really about an aggregate of information that you don't normally expect to be exposed, and I might expect my neighbor to take a glance over at my house every once in a while, but I don't expect them to watch me for, you know, I know this isn't this case, but say, six months straight, just staring at the back of my house. And that is the idea of the mosaic theory, that the aggregate, the ongoing observation of somebody can transform the observation. Sure. So, I mean, I guess I would initially press back on the notion that a neighbor would only be expected to take a quick glance at the house. I think Judge Lynch in the First Circuit concurrence goes through convincingly how, when you are living in a neighborhood and you are exposing your home to neighbors, it would be reasonable to expect neighbors to be noting observations over time and putting together information. You know, one night seeing a fight between spouses, another night seeing the car is no longer there, a few nights later seeing, like, the kids seeming to go off with one of the spouses. So, in other words, it is not like the Carpenter situation, where just there's no reason to think that someone would be able to track you all over town. Instead, when you are in this sort of situation, you very much are in a situation where someone could be putting together this information. I think also on Judge Garcia's earlier questions as to the judicial notice and the reasonable expectation of privacy in this home, the defendant's ties to this home, just to clarify, the court did not say, the district court did not say it was taking judicial notice of everything on the docket. Instead, it said, this is out of Appendix 377, that it could take judicial notice of items on the docket, and what the district court took judicial notice of is what had happened in the prior suppression hearing. It did not suggest that it was taking judicial notice of, for example, the bail motion, and so the bail motion would be far outside the record. The prior suppression hearing did not go into the evidence as to what was found inside the home, and I think it is notable that on Appendix pages 380 to 383, the defendant was given a very fair chance to put on evidence as to his ties to the home. The district court asked about something that is at least concerning about this. So, in order for him to show he had a Fourth Amendment interest in the premises, he would essentially have to incriminate himself, maybe offer a lease or some other evidence of his permission to be there, and that seems unusual to me. Can you think of other situations where, in order to raise a Fourth Amendment claim, someone would have to incriminate themselves? Well, so I think, I guess I'd point to a couple of aspects of that. First is that when a defendant testifies at a suppression hearing, that cannot come in as substantive evidence at the trial for that very reason, and so there are these built-in protections to allow a defendant to make a Fourth Amendment claim and not incriminate himself at trial, and I think this court's decision in Hicks that we cite in the case in our brief is helpful on this, and that goes through how a defendant has to make this showing at the suppression hearing, even if further evidence comes out at trial, that doesn't undo the showing that's made at the suppression hearing, and Hicks does discuss how a defendant can testify at the suppression hearing without having to worry about incriminating himself. I think that you're standing, the theory of standing here is problematic because it suggests that it puts a really big burden on a defendant who wishes to make a particular type of evidence, which is a lease or direct evidence that a person on the lease gave permission for that defendant to be there. That's just a very specific kind of evidence that seems like would be necessary to meet the burden that the district court and you are advocating here, and it just seems to me that if that were in fact required, there would be some direct case law on this, and we were not able to find any. I think Hicks is direct case law on this that we cite in the brief, but I think this is very much consistent with how burdens work in the Fourth Amendment context, that a defendant is the one who has the burden to initially show that he has ties to the place where he's saying. He's shown ties, but it seems like you want more, you want permission, which, I mean, we could sidestep this issue by just saying on this record, this evidence, it seems it's a preponderance standard. It seems more likely than not that he had permission given the length of time that he was there. There's evidence showing he was there over the holidays, and he was, you know, that he's been there overnight. He seems to be the sole occupant. Even though that doesn't go directly to permission, it seems more likely that he had permission given the amount of time he was there. So, your honor, I think that's conflating the trial evidence and the suppression evidence. I don't think we're necessarily making the argument that the trial evidence would have been insufficient in this case, although I think that would be an open question. Instead, the problem is that at the suppression hearing, none of that was before the district court. The district court asks, this is in 380 to 383, the district court asks the defendant, how is it that you're making a showing of ties to this apartment, to this home? Initially, you had suggested this is your home. Now you're saying you were just couch surfing there. How is it that you are showing you have a Fourth Amendment interest in this home? And the defendant's response is, we concede that's a weakness of our motion. We are not putting on affirmative evidence of that. That's on 380 to 383 of the appendix. And so, that's what happened at the suppression hearing. And I think that's the record under Hicks that has to be considered. What evidence links him to the home from the suppression hearing? Correct, Your Honor. I'm asking you. The evidence that links him to the home from the suppression hearing is simply his presence there when the police, I guess it's not even his presence there when the police arrive. It's just the whole camera observations of him overnight, stepping out onto the back porch and shooting a gun. That's what linked him from the suppression hearing. So, it seems like this standing argument is sticky and would require us to make potentially new law that creates quite a burden, I think, on criminal defendants. And it seems to me that we can assume standing and say that even if there were standing, there was no reasonable expectation of privacy. That might be the easiest way to address this case. Sure. I don't think we're saying this court needs to address standing. Yes. And the Supreme Court has explained that standing in this context, although the term standing is sometimes used, it's a misnomer. And really, it's not a jurisdictional type requirement in the way we normally think of standing. So, there are multiple alternative arguments. And I think this court could resolve it on any one of those. And it seems, too, that any kind of sticky issues about poll cameras and extended surveillance aren't really raised by this case where this poll camera was up for only two days. That's correct, Your Honor. Yes. I don't think this court has to use this case to resolve the poll cameras. As we go through, there are multiple potential problems. It's unclear why this would be the curtilage of the defendants or that this would be the curtilage of the property and it's the defendant didn't show any sort of subjective expectation of privacy in this area where there's no fences, no shrubs, no shielding. And so, yes, we think there are multiple alternative arguments that this court could rule on here. Can I just have a few questions about the text message? Yes, Your Honor. So, it seems to me it was admitted just for the purpose of showing intent and... I think it's both for intent and knowledge, knowledge going to knowing possession, which is important in a constructive possession case. That would be important. I think at least the district court's order only references intent. Can we just focus on intent for the moment? Maybe it's also knowledge. But for intent, it's hard for me to describe how it's not a propensity inference. It seems like the inference is supposed to be because he was selling drug A at one time. It's more likely he was selling drugs B through D at a second time. And that, to me, is classic propensity reasoning. Why is that the wrong way to think about it? So, this court has a whole series of cases, the Crowder en banc case. Sure. Can you just articulate how it goes to intent in a way that's not obviously a propensity inference? Sure. So, I think it is that when a defendant has drugs, when we think he has drugs, and the question is, what is he intending to do with those drugs? The fact that he has previously sold them suggests that in this case, that is also his intent at the time that he is holding the drugs. This court's case is recognized. The intent line is close to the propensity line. But this court has about 10 cases, including an en banc decision, that is drawing this line. We do have a lot of cases like that. And in many of them, there are additional facts where it is not just a pure inference that because the person sold a drug this time, they're more likely to do it now. In the en banc case, there was evidence that they had sold drugs previously at this location, packaged in this way. Whereas here, it doesn't seem like we have any of those kinds of similarities. It really is just, he said he wanted to sell marijuana, so it's more likely he wanted to sell cocaine. And I don't think, at least as to when the drugs are different, I'm not sure we have a case that is that broad. I mean, I think that there are repeated cases that are along those lines that involve the same drug. I agree that Mitchell's the only case that involves different drugs from this court, that there are multiple out-of-circuit decisions that involve. Do you agree that Mitchell is, in a lot of ways, had the kinds of similarities I was talking about? It didn't just say, well, there was this prior uncharged meth deal, and so you can use that for intent. As to Mr. Mitchell, it went into great detail about how it was not just intent, it showed he had previously engaged in a drug transaction with the same person, and in fact done the same thing. We described it as it was being admitted to show his intent in driving, in this case, it was the drugs. In the prior episode, he was driving proceeds a very long distance. And I can see how, when you have those kinds of specific similarities, it almost shades into MO, or something other than a pure propensity inference. But here again, it's just he sold marijuana, so he must have sold the cocaine. Yeah, I mean, I think I certainly agree that Mitchell had additional facts beyond what were presented here. I do think this court's cases repeatedly are saying you can draw this sort of previously sold the drugs, and it is not a propensity inference. And the fact that it involves different drugs doesn't make it, doesn't turn it into a propensity inference. I think that instead of a 404 problem, the question would then go to, is this a 403 issue? Meaning the jury can, can't help but make the propensity inference. But I think that that does not transform it into a problem under this court's cases. And in terms of the 403, what we have here, I mean, I think it's notable that this was very carefully litigated below. Both sides filed written pleadings. The district court puts out a written order. The district court recognizes limitations from the fact that it does involve a district, a different drug, but nonetheless says, given the timing, given the language of the text message, it is still a proper 403 evidence. And that's the kind of finding by a district court who's sitting at the trial that this court should be reluctant to upset. But even if there were a 403 issue, I think the notion here that the defendant was convicted of possession of a machine gun and tens of thousands of dollars of these serious drugs, because there was evidence that he was selling a small amount of marijuana, just doesn't really hold water. And notably in this case, in the testimony from the expert, the expert says marijuana is legal in other jurisdictions, in certain jurisdictions. So that kind of lessens any sort of inference from it. It comes out that he's not being charged with selling marijuana. The government in its closing, even though the government's request for a limiting instruction is rejected by the defense, the government in closing at appendix 1237 carefully limits its argument to the permissible uses as to the text message. And so I think on this record, there's no real way to make a finding of prejudice, particularly given the strong evidence of the defendant's intent to distribute and the defendant's guilt in this case. If there are no further questions, we'd ask this court to affirm. Mr. Bronco, why don't you take two minutes? Thank you, Your Honor. I just want to briefly respond to some of the government's arguments regarding the poll camera that we didn't have a chance to discuss initially. First, regarding the statement in Carpenter regarding security cameras, that statement has no bearing on this reasons. First, the court in Carpenter had no opportunity to consider a camera continuously pointed at a home. Second, that statement is best read as referring to the third-party doctrine. It's in the same sentence discussing the third-party doctrine. Third, this is not a conventional camera. This is a camera with unlimited support on the cloud in terms of recording capability. And fourth, it's not a security camera. This is a camera placed by police as part of a criminal investigatory purpose. The government also raised the nosy neighbor hypothetical. I'll just note that the Supreme Court in Carpenter at 2219 of the Supreme Court reporter also mentions the nosy neighbor and draws a distinction between a neighbor who is nosy and the kind of unrelenting, constant, 24-7 review that the cell site location information was doing, but that here the poll camera is doing. The government also mentioned cartilage. This is a red herring. The point is that Mr. Green has a reasonable expectation of privacy in the space around his home. This camera undoubtedly captured that space. It captured his back door. What about the duration? That might be one of the government's best arguments. Sure, Your Honor. In terms of the duration, I think the logic of Carpenter strongly suggests that two days of this sort of tracking does rise to the level of a Fourth Amendment search. While the court in a footnote said it was limiting its holding to seven days, it didn't say that less than seven days couldn't qualify. There, the government had only received two days' worth of data from Sprint, and the court still held that the data from both wireless carriers qualified as a search. Here, we're talking about accessing footage. I think accessing two full days' worth of footage is more than an individual would reasonably expect. Where's the line? Would one day be too much? The court obviously doesn't have to decide that here. One possible way to draw this line would be not. That's the case concerning the beeper in the car. The government used the beeper to track a car over a limited duration over one car drive. The court there said, once we talk about 24-hour surveillance, different principles may come into play. So I think that's one possible line the court could draw here. Frankly, for me, if the government placed a camera looking in my backyard for days, I would feel like my privacy was violated, and I think most Americans would, too. Ruling for the government on their first argument would allow the police to put cameras in all of your homes, my homes directed at our front and back doors, look at that footage whenever they want. That violates the reasonable expectation of privacy. Thank you, Your Honors.
judges: Henderson; Pan; Garcia